IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JOHN FERGUSON,                      :
                                    :
        Plaintiff                   :        CIVIL NO. 1:CV-10-02638
                                    :
v.                                  :        (Judge Rambo)
                                    :
T.R. SNIEZEK, *et al.*,             :
                                    :
        Defendants                  :

**M E M O R A N D U M**

Plaintiff John Ferguson, an inmate currently incarcerated at the Federal

Correctional Institution at Schuylkill ("FCI-Schuylkill") in Minersville,

Pennsylvania, filed this *Bivens*[1]-type action on December 27, 2010 against several

FCI-Schuylkill officials and medical providers.[2]  (Doc. 1.)  In the complaint,

---

[1] *Bivens* actions are the federal counterpart to § 1983 claims brought against state officials.  *Egervary v. Young*, 366 F.3d 238, 246 (3d Cir. 2004) (citing *Brown v. Philip Morris, Inc.*, 250 F.3d 789, 800 (3d Cir. 2001)).  "[C]ourts have generally relief upon the principles developed in the case law applying section 1983 to establish the outer perimeters of a *Bivens* claim against federal officials."  *Schrob v. Catterson*, 948 F.2d 1402, 1409 (3d Cir. 1991).

[2] Plaintiff names the following Defendants: T.R. Sniezek, former Warden, FCI-Schuylkill; Kim Ask-Carlson, former Associate Warden; Kevin Christeleit, Case Manager; Joseph Rush, Physician's Assistant; David N. Steffan, Physician's Assistant; and Federal Bureau of Prisons.  These Defendants were properly served and have thus filed the instant motion to dismiss or, in the alternative for summary judgment.  In the complaint, Plaintiff also names the following individuals as Defendants: Russell C. Hendershot, Health Service Administrator; Eileen Falzini, Health Service Administrator; Patrick Burns, Emergency Medical Technician; and Brigida Zabala, Physician's Assistant.  However, waivers of service were returned unexecuted as to these Defendants.  (*See* Doc. 23.)  Therefore, by order dated August 5, 2011, the court directed Plaintiff to provide the court with the current addresses for these Defendants by August 20, 2011, and informed Plaintiff that failure to provide addresses for these Defendants would result in their dismissal.  (Doc. 27.)  To date, Plaintiff has failed to provide the court with the addresses of these Defendants.  As the plaintiff is responsible for identifying the Defendants and providing their

Plaintiff asserts that Defendants have been deliberately indifferent to his serious medical needs related to cataracts in both of his eyes that has resulted in aggravation of his anxiety disorder. He also asserts related claims under the Federal Tort Claims Act ("FTCA"), the Americans with Disabilities Act ("ADA"),[3] and related state law claims.

Before the court is Defendants' motion to dismiss and for summary judgment. (Doc. 20.) For the reasons set forth below, the motion for summary judgment will be granted in favor of Defendants.

## I. Background

The following facts are related to Plaintiff's claims. The court notes any

---

addresses in order to effectuate service, *see* Fed. R. Civ. P. 4(c)(1) ("The plaintiff is responsible for having the summons and complaint served"), and Plaintiff has failed to do so here, the matter as to Defendants Hendershot, Falzini, Burns, and Zabala will be dismissed. *See Fulton v. United States*, 198 F. App'x 210, 214 (3d Cir. 2006) (stating plaintiff is responsible for identifying the parties named as defendants in order to effectuate service).

[3] In their brief in support, Defendants argue that the ADA does not form the basis for a cause of action in Plaintiff's case. (Doc. 31 at 44-45.) In his brief in opposition, Plaintiff concedes this point. (Doc. 63 at 44.) Because it is well-established that a claim of a violation of a Plaintiff's rights under the ADA does not apply to the federal government, its agencies, or employees, this claim will be dismissed as to these federal Defendants. *See, e.g., See Iseley v. Beard*, 200 F. App'x 137 (3d Cir. 2006) (claim of denial of medical treatment for disabilities is not encompassed by the ADA's prohibitions)*; United States v. Wishart*, 146 F. App'x 171, 173 (9th Cir. 2005) ("By definition, the ADA does not apply to the federal government."); *Luna v. Roche*, 89 F. App'x 878, 881 n.4 (5th Cir. 2004) ("The ADA does not apply to the federal government."); *Howard v. Bureau of Prisons*, Civ. No. 3:05-CV-1372, 2008 WL 318387, *9 (M.D. Pa. Feb. 4, 2008).

factual disputes between the parties by presenting both parties' contentions.

### A.   Facts

When Plaintiff arrived at FCI-Schuylkill on March 28, 2005, he had a medical intake screening conducted by his assigned primary care provider, Defendant Physician's Assistant ("PA") David Steffan.  (Doc. 30 ¶¶ 2, 18.) Plaintiff's medical history included significant mental health concerns, including suicide attempts.  (*Id*. ¶ 19.)  The health intake assessment form and PA's medical notes do not note Plaintiff's eye-related issues.  (*Id*. ¶ 20; Doc. 30-1 at 22-25, Ex. A, Attach. 3, Medical Records.)  Plaintiff, however, asserts that he did mention to PA Steffan that he was having problems with his vision.  (Doc. 64 ¶ 20.)

On March 31, 2005, another PA conducted Plaintiff's Admission and Orientation physical.  (Doc. 30 ¶ 21.)  Plaintiff asserts that he asked the PA to check his eyesight.  (Doc. 64 ¶ 21.)  Plaintiff's vision was recorded as 20/50 in the right eye, 20/30 in the left eye, his color vision was normal, and he had no complaints of problems with night vision.  (Doc. 30 ¶¶ 22-23.)  Plaintiff claims that these tests were for his "distant vision," and that his "near vision" was not checked.  (Doc. 64 ¶ 22.)

On April 4, 2005, Plaintiff was seen and examined by a Dr. Chaw because he had been placed on suicide watch.  (Doc. 30 ¶ 24.)  As a result of his mental

health issues, on April 6, 2005, Plaintiff was transferred to the Federal Medical Center in Devens, Massachusetts ("FMC-Devens"), for adjustment of his medication and monitoring.  (*Id*. ¶ 26.)  During his eight months at FMC-Devens, Plaintiff requested to see an eye doctor twice.  (*Id*. ¶¶ 27, 28.)  On December 11, 2006, Plaintiff returned to FCI-Schuylkill and had a medical intake screening with an EMT.  (*Id*. ¶ 29.)  The notes from that screening do not indicate any eye-related issues, but Plaintiff asserts that he asked the EMT for an exam by an eye doctor. (Doc. 30-1 at 34-36; Doc. 64 ¶ 29.)

Almost a year later, Plaintiff reported to sick call on November 16, 2007, complaining of blurred vision and cataracts.  (Doc. 30 ¶ 30.)  Plaintiff asserts that he had previously submitted a Request to Staff form to the Health Services Unit on November 5, 2007, complaining of problems with his vision, as well as communicating with Dr. Hendershot and Dr. Chaw about his vision problems. (Doc. 64 ¶¶ 30, 31.)  At sick call, PA Steffan examined Plaintiff and noted that an optometry consult would be submitted.  (Doc. 30 ¶ 31.)  On November 30, 2007, Plaintiff reported to sick call again complaining of blurred vision.  (*Id*. ¶ 32.)  PA Zabala examined Plaintiff, noted his vision, and scheduled an evaluation with a contract optometrist for that same day in order to rule out cataracts.  (*Id*. ¶ 33.) Plaintiff adds that PA Zabala noted that Plaintiff was on a "medically unassigned"

4

work duty status that would expire on "February 30, 2008."[4]  (*See* Doc. 67 at 7, Ex. C.)

Upon his evaluation on November 30, 2007, the optometrist indicated cataracts in both eyes, with the left eye having a "total mature cataract."[5]  (Doc. 30 ¶ 34; Doc. 30-1 at 38-39.)  The optometrist stated that a cataracts consult was needed to do surgery, starting with the left eye.  (Doc. 30 ¶ 34.)  Also, Plaintiff's vision was recorded as 20/60 in the right eye and 20/40 in the left eye.  (*Id*. ¶ 35.)  Plaintiff also asserts that he told the optometrist that he could not see out of his left eye, and that his eyeglasses were lost.  (Doc. 64 ¶ 35.)

Two weeks later, on December 17, 2007, Plaintiff was seen again by the optometrist, who ordered eyeglasses for Plaintiff for use until the surgery could be

---

[4] The court takes judicial notice of the fact that the month of February in our yearly calendar never has thirty (30) days; however, for purposes of the instant motion, the court will quote the date noted in Plaintiff's record.

[5] In his exhibits filed in support of his opposition to the instant motion, Plaintiff attaches a document that Defendants concede defines the stages of cataracts.  (Doc. 67 at 60, Ex. M.)  That definition includes:

> There are three stages of cataracts currently defined: immature, mature and hypermature.  If an individual still maintains part of their vision, meaning the lens still has some clear areas, the cataracts is said to be immature.  A mature cataracts is one which is entirely clouded over or opaque.  Finally, a hypermature cataracts has begun to leak fluid from its hard outer capsule which may lead to problems with adjacent areas of the eye.

(*Id*.)

completed. (Doc. 30 ¶ 36.) Plaintiff's vision was recorded as 20/60 in the right eye and 20/40 in the left eye. (*Id*. ¶ 37.) The medical notes also indicate that Plaintiff stated that he noticed blurred vision "6 or 7 weeks ago." (Doc. 30-1 at 40; Doc. 64 ¶ 36.)

On January 7 and 22, 2008, Plaintiff reported to sick call, requesting the status of his appointment with the ophthalmologist and was advised that the consultation was pending. (Doc. 30 ¶¶ 38-39.) The medical notes also indicate that Plaintiff was on a work duty restriction. (Doc. 30-1 at 41; Doc. 64 ¶ 38.)

On February 12 and 19, 2008, Plaintiff was seen again by the contract optometrist, who recommended that Plaintiff have a cataract surgery consult "ASAP." (Doc. 30 ¶ 40; Doc. 30-1 at 42; Doc. 64 ¶ 40.) On February 12, 2008, Plaintiff's vision was recorded as 20/100 in the right eye and 20/70 in the left eye. (Doc. 30 ¶ 41.) On February 19, 2008, his vision was recorded as 20/150 in the right eye and no reading was noted for the left eye. (*Id*. ¶ 42.)

On March 27, 2008, Plaintiff received new eyeglasses. (*Id*. ¶ 43.) Also, Plaintiff asserts that Warden Sniezek responded on April 8, 2008, to a request Plaintiff previously filed, acknowledging that an ophthalmologist appointment had been scheduled and the eyeglasses had been provided on March 27, 2008. (Doc. 64 ¶ 43.)

On April 16, 2008, Plaintiff was seen by the contract ophthalmologist for a cataract surgery consult. (Doc. 30 ¶ 44.) The ophthalmologist noted mixed cataracts, with the left eye worse than the right eye. (*Id*. ¶ 45.) He also noted that surgery would not guarantee improvement of Plaintiff's visual acuity. (Doc. 30 ¶ 46; Doc. 30-1 at 46; Doc. 64 ¶ 46.) Plaintiff asserts that the ophthalmologist informed him that "delayed surgery . . . can cause permanent blindness because a mature cataract can become hypermature and begin to leak fluid into the adjacent areas of the eye." (Doc. 65 ¶ 34, Ferguson Decl.; Doc. 64 ¶ 46.) However, other than Plaintiff's bald assertion, he has not presented any evidence or documentation that the ophthalmologist made this statement, or that the opthamologist suggested that Plaintiff was in danger of developing a hypermature cataract.

On June 18, 2008, Plaintiff reported to sick call complaining of "eye problem persist - pending surgery - I can't see, it interferes with work and daily activities." (Doc. 30 ¶ 47; Doc. 30-1 at 48.) Plaintiff asserts that this visit was a result of a grievance he filed on June 17, 2008. (Doc. 64 ¶ 47.) PA Zabala noted that surgery was pending.[6] (Doc. 30 ¶ 48.)

---

[6] Plaintiff does not dispute this material fact, but adds "[PA Zabala] confidence [sic] that she was being pressured by Dr. Hendershot, AHSA Rush, who she contended was not qualified for the AHSA position, and Warden Sniezek and AW Kim Ask-Carlson, regarding the compassionate care she attempted to provide Ferguson." (Doc. 64 ¶ 48.)

On August 20, 2008, information was sent to the ophthalmologist's office regarding the surgery scheduled for September 17, 2008. (*Id*. ¶ 49.) On September 15, 2008, Plaintiff was examined by Dr. Hendershot during a chronic care clinic visit. (*Id*. ¶ 50.) Two days later, on September 17, 2008, the ophthalmologist performed cataract surgery on Plaintiff's left eye. (*Id*. ¶ 52.) The ophthalmologist also provided Plaintiff with a pair of solar shield eyeglasses after the surgery and directed him to protect his eyes from bright light. (Doc. 64 ¶ 52.) Further, a follow-up appointment with the ophthalmologist was scheduled for September 18, 2008. (Doc. 30 ¶ 53.) Plaintiff adds that the ophthalmologist recommended surgery on the right eye for three months later if complications did not develop. (Doc. 64 ¶ 53.) Upon Plaintiff's return from surgery, PA Zabala and Dr. Hendershot noted the medications and restrictions, including the use of the solar shield eyeglasses and "medically unassigned" work duty status. (Doc. 30 ¶¶ 54-55; Doc. 64 ¶ 54.)

On December 16, 2008, Plaintiff was seen by the contract optometrist, who recommended cataract surgery for Plaintiff's right eye. (Doc. 30 ¶ 56.) Plaintiff informed the optometrist that the vision in his left eye "has improved." (*Id*. ¶ 57.) His vision was recorded as 20/100 in the left eye and "less than 20/400?" in the

right eye.[7]  (*Id.*)  Plaintiff adds here that at this time, Dr. Hendershot resigned and

there was no staff physician or clinical director at FCI-Schuylkill.  (Doc. 64 ¶ 57.)

On January 23, 2009, Plaintiff received a new pair of eyeglasses, as recommended

by the optometrist.  (Doc. 30 ¶ 58.)

On February 27, 2009, PA Steffan examined Plaintiff, noted the

optometrist's recommendation for cataract surgery on Plaintiff's right eye, and

submitted a consultation for the surgery.  (*Id.* ¶ 59.)  Also, Plaintiff's vision was

recorded as 20/40 in the left eye and 20/400 in the right eye.  (*Id.* ¶ 60.)

On March 2, 2009, PA Steffan discussed the surgery with the

ophthalmologist's surgical coordinator, who indicated that an appointment for an

evaluation and measurement of eye implant was first needed before surgery could

be scheduled.  (*Id.* ¶ 61; Doc. 30-1 at 66.)  On that same day, PA Steffan initiated

another consultation for this evaluation appointment.  (Doc. 30 ¶ 62.)  However,

on March 9, 2009, the Utilization Review Committee ("URC") at FCI-Schuylkill

disapproved the consultation for cataract surgery because Plaintiff's condition did

not meet Bureau of Prisons' ("BOP") policy or criteria from BOP clinical

guidelines.  (*Id.* ¶ 63.)  According to BOP Program Statement 6031.01, "Patient

---

[7] Defendants assert that the "?" noted in Plaintiff's record indicates that the optometrist felt Plaintiff was malingering his visual acuity.  (Doc. 30 ¶ 57 n.1.)

Care," cataract surgery is considered an elective procedure for a condition described as medically acceptable, but not always necessary. (*Id*. ¶ 64.) Further, according to BOP Clinical Practice Guidelines for Ophthalmology, elective surgery is only authorized if medically necessary.[8] (*Id*. ¶ 65.) More specifically, those guidelines state that "There must be documentation of a best-corrected visual acuity of less than 20/60 in both eyes with current (less than six months old) refraction. Second eye surgery requires a documented, best-corrected visual acuity of 20/100 or less." *See* OPHTHALMOLOGY GUIDANCE, Federal Bureau of Prisons (Feb. 2008), *available at* http://www.bop.gov/news/PDFs/opthamology_guidance_2008.pdf (last visited July 25, 2013) (hereinafter "Ophthalmology Guide"). Although the URC denied the surgery consultation, it approved the consultation for an evaluation appointment with the ophthalmologist. (*Id*. ¶ 66.)

With respect to the disapproval by the URC, Plaintiff asserts that the medical records supporting the disapproval were "fraudulently generated." (Doc. 64 ¶ 63.) Further, he denies that his cataract surgery is an elective procedure,

---

[8] Plaintiff denies this material fact, arguing that the court should not consider these guidelines because Defendants do not provide them in their supporting exhibits in order to establish this fact. (Doc. 64 ¶ 65.) While Defendants do not provide the BOP Clinical Practice Guidelines for Ophthalmology in their exhibits in support of summary judgment, in a supporting brief, they provide a link to the guidelines. (*See* Doc. 74 at 15 (citing Ophthalmology Guide)). Thus, in light of the documentary support for this statement, the court will consider this statement in its disposition of the instant motion for summary judgment.

citing to the recommendations of the optometrist and ophthalmologist that "without cataract surgery Ferguson's cataract condition 'could not be maintained without significant risk of' permanent blindness." (*Id*. ¶ 64) (citing Doc. 67 at 25, Ex. F.) However, the medical records to which Plaintiff cites contain no prognosis of "permanent blindness." (*See* Doc. 64 ¶ 64) (citing Doc. 30-1 at 17-19; 21-23; 25; 38; 51).

On April 24, 2009, Plaintiff had the evaluation appointment with the ophthalmologist, who recommended cataract surgery for a mature cataract of Plaintiff's right eye. (Doc. 30 ¶ 67.) However, the ophthalmologist noted that he could not guarantee satisfactory results from the surgery. (*Id*.; Doc. 30-2 at 1.) Plaintiff adds that the ophthalmologist made similar comments prior to the cataract surgery on Plaintiff's left eye, which proved to be successful. (Doc. 64 ¶ 67.) During the evaluation, Plaintiff's vision was recorded as 20/60 in the left eye, but Plaintiff stated that he could not see anything on the eye chart from his right eye, but could see hand movement. (Doc. 30 ¶ 68.) Plaintiff denies that he made such a statement regarding the vision in his right eye. (Doc. 64 ¶ 68.) After the evaluation, PA Steffan wrote a consultation for the scheduling of the cataract surgery, which Plaintiff asserts was approved at that time but had been previously scheduled for April 22, 2009. (Doc. 30 ¶ 69; Doc. 64 ¶¶ 69, 71.)

On May 12, 2009, the acting Clinical Director reviewed the information and disapproved PA Steffan's consultation pending receipt of more information regarding Plaintiff's visual acuities and whether Plaintiff met the ophthalmology Clinical Practice Guidelines for cataract excision. (Doc. 30 ¶ 70.) In his opposition, Plaintiff claims that the medical records submitted in connection with the consultation were "fraudulently generated" and "falsified," and therefore the surgery was delayed. (Doc. 64 ¶¶ 70-71.)

On March 15, 2010, PA Steffan spoke with Health Services Administrator Falzini about a resubmission of a consultation for the cataract surgery for Plaintiff's right eye. (Doc. 30 ¶ 71.) It was agreed that another consultation for surgery should be submitted. (*Id*. ¶ 72.) Plaintiff claims that the Administrative Note containing this information, (*see* Doc. 30-2 at 7), was fabricated by PA Steffan to somehow conform with the previously-mentioned allegedly fraudulent medical records used by the URC to disapprove the surgery in March 2009. (Doc. 64 ¶ 71.) Nevertheless, on May 10, 2010, the URC approved the consultation for cataract surgery of Plaintiff's right eye. (Doc. 30 ¶ 73; Doc. 30-2 at 10.) However, Plaintiff asserts that the medical record noting this approval was "fraudulently generated," and that, in fact, the consultation was not approved by the URC on May 10, 2010. (Doc. 64 ¶ 73.)

12

On July 13, 2010, Regional Counsel from the Northeast Regional Office of

the BOP sent Plaintiff a response to Plaintiff's Administrative Tort Claim No.

TRT-NER-2010-01972, which was received by the BOP on January 15, 2010.

(Doc. 67 at 97, Ex. T.)  The response states, in relevant part:

> Your Administrative Tort Claim No. TRT-NER-2010-01972,
> properly received by the United States on January 15, 2010, has been
> considered for settlement as provided by the Federal Tort Claims Act
> (FTCA), 28 U.S.C. § 2672, under authority delegated to me by 28
> C.F.R. § 543.30.  You seek compensatory damages in the amount of
> $1,000,000.00 for alleged medical negligence by staff at FCI
> Schuylkill in addressing medical problems and delivering healthcare
> related to your cataracts beginning in November 2007.
>
> After careful review of this claim, I have decided not to offer a
> settlement.  Investigation reveals you were placed at FCI Schuylkill
> from December 11, 2006.  You were evaluated on numerous
> occasions by an Ophthalmologist, had surgery on your left eye, were
> educated on your medical condition, and you were provided a
> prescription for eyeglasses.  On February 27, 2009, you reported to
> sick call with a surgical request for your right eye.  You were
> diagnosed with a mature cataract on your right eye.  On April 24,
> 2009 you were evaluated by an Ophthalmologist, who could not
> guarantee satisfactory surgery results.  A second consult request was
> sent on May 12, 2009.  You have made no additional sick calls
> related to your eye between May 2009 and the filing of this tort claim.
> On March 15, 2010 the primary care provider was instructed to
> resubmit your consult request.  There is no evidence you did not
> receive proper or timely medical care while at FCI Schuylkill.  As you
> did not suffer a compensable loss as the result of the actions of FCI
> Schuylkill, your claim is denied.

(*Id*.)

On September 17, 2010, PA Steffan examined Plaintiff and noted that the frame of his eyeglasses was broken and the hinge on the side was missing. (Doc. 30 ¶ 74.) As a result, PA Steffan issued an optometry consult for the issuance of new frames. (*Id.* ¶ 75.) Thereafter, on November 23, 2010, the contract optometrist examined Plaintiff and ordered frames, and Plaintiff received his new eyeglasses on February 9, 2011. (*Id.* ¶ 76.)

On January 20, 2011, Plaintiff was examined by PA Steffan during a chronic care clinic appointment. (*Id.* ¶ 77.) It was noted that Plaintiff's cataract surgery was still pending. (*Id.* ¶ 78.) It was further noted that Plaintiff had an office evaluation scheduled with a general surgeon for a possible hernia on his right side. (*Id.*; Doc. 30-2 at 15.)

On April 12, 2011, Plaintiff was examined by PA Steffan during a chronic care clinic appointment. (Doc. 30 ¶ 80.) It was again noted that Plaintiff's cataract surgery and hernia repair were pending. (*Id.*)

On April 27, 2011, Plaintiff had an appointment with the contract ophthalmologist, who measured the cataract in Plaintiff's right eye. (*Id.* ¶ 81.) Upon his return from that appointment, Plaintiff was seen by the institution's EMT. (*Id.* ¶ 82.)

On May 9, 2011, Plaintiff had a pre-operative appointment with PA Steffan.

(*Id*. ¶ 83.)  At that time, Plaintiff needed an EKG in preparation for the cataract surgery.  (*Id*. ¶ 84.)  That EKG was completed on May 10, 2011.  (*Id*. ¶ 85.)

On May 11, 2011, the ophthalmologist performed cataract surgery on Plaintiff's right eye.  (*Id*. ¶ 86.)  A follow-up appointment with the ophthalmologist was scheduled for the next day.  (*Id*. ¶ 87.)  As a result, on May 12, 2011, Plaintiff was taken to the ophthalmologist's office for his follow-up appointment.  (*Id*. ¶ 88.)  Plaintiff adds that at the appointment, the ophthalmologist provided him with a prescription for solar shield sunglasses, to wear "as needed," and educated him on post-operative care of his eye.  (Doc. 64 ¶ 88.)  In addition, another appointment was noted for 1-2 weeks.  (Doc. 30 ¶ 89.)

On May 13, 2011, PA Steffan examined Plaintiff for follow-up, provided him with an authorization to wear sunglasses only when he was outdoors, and submitted a consultation for a follow-up appointment with the contract ophthalmologist.  (*Id*. ¶ 90.)  Plaintiff points out that the authorization to wear sunglasses outdoors only differs from the ophthalmologist's instructions to wear them "as needed."  (Doc. 64 ¶ 90.)  PA Steffan review this consult with the new Clinical Director Mace-Leibson.  (Doc. 30 ¶ 91.)

On May 24, 2011, Plaintiff reported to sick call for a refill of his eye drop medication.  (*Id*. ¶ 92.)  Because the post-surgery instructions from the

15

ophthalmologist did not indicate any refills for eye drops, PA Steffan called the ophthalmologist's office and received further instructions to continue the eye drops for Plaintiff until his next follow-up appointment.  (Doc. 30 ¶ 93.)

On June 15, 2011, Plaintiff had another follow-up appointment with the ophthalmologist.  (*Id*. ¶ 94.)  At that time, Plaintiff's vision was recorded as 20/30 in the right eye and 20/25 in the left eye.  (*Id*. ¶ 95.)  PA Rush saw Plaintiff upon his return from this appointment and noted the medications and submitted a consultation for another follow-up appointment requested by the ophthalmologist for July 2011.  (*Id*. ¶ 96.)  That appointment was scheduled for August 3, 2011. (*Id*. ¶ 97.)

### B.    **Procedural History**

Plaintiff filed his complaint on December 27, 2010.[9]  (Doc. 1.)  After waiving service of the complaint and receiving extensions of time (*see* Docs. 12, 16), Defendants filed a motion to dismiss or, in the alternative, for summary judgment on July 18, 2011, (Doc. 20).  A statement of material facts and brief in support followed on August 5, 2011.  (Docs. 30 & 31.)  After several extensions of

---

[9] Plaintiff had counsel when he filed his complaint.  However, by order dated October 3, 2011, the court granted counsel's motion to withdraw, and afforded Plaintiff until November 15, 2011 to acquire new counsel.  (Doc. 41.)  The court also informed Plaintiff that if new counsel was not obtained, Plaintiff would be deemed to be proceeding *pro se*.  (*Id*.)  Plaintiff did not obtain new counsel and currently proceeds *pro se*.

time were granted, (Docs. 53, 57 & 60), Plaintiff failed to file a timely brief in

opposition.  Therefore, by order dated April 16, 2012, the court granted the motion

to dismiss the complaint and closed the case.  (Doc. 61.)  Shortly thereafter,

Plaintiff filed his brief in opposition and counter statement of material facts.

(Docs. 63 & 64.)  He also filed a motion for reconsideration on May 10, 2012,

requesting that the court vacate its April 16, 2012 order and reopen the case.

(Doc. 69.)  By order dated May 17, 2012, the court granted Plaintiff's motion for

reconsideration, vacated the April 16, 2012 order, and reopened the case.  (Doc.

71.)  The court also afforded Defendants the opportunity to file a reply brief.  (*See

id*.)  After the court granted an extension of time, (Doc. 73), Defendants filed that

reply brief on June 8, 2012, (Doc. 74).  Thus, this matter is now ripe for

disposition.


## II.   **Standards of Review**

### A.   **Motion to Dismiss**

Defendants filed a motion which, in part, seeks dismissal of the amended

complaint on the grounds that Plaintiff's complaint fails to state a claim upon

which relief can be granted, as provided by Rule 12(b)(6) of the Federal Rules of

Civil Procedure.  The motion, however, goes beyond a simple motion to dismiss

under Rule 12(b)(6) because it is accompanied by evidentiary documents outside

the pleadings contravening Plaintiff's claims.  Rule 12(d) provides as follows:

> If, on a motion under Rule 12(b)(6) or (12)(c), matters outside the
> pleadings are presented to and not excluded by the court, the motion
> must be treated as one for summary judgment under Rule 56.  All
> parties must be given a reasonable opportunity to present all the
> material that is pertinent to the motion.

Fed. R. Civ. P. 12(d).  The court will not exclude the evidentiary materials

accompanying Defendants' motion to dismiss because Plaintiff has also been

given a reasonable opportunity to present material relevant to the motion.  Thus,

Defendants' motion to dismiss and for summary judgment shall be treated solely

as seeking summary judgment.

### B.    Motion for Summary Judgment

Federal Rule of Civil Procedure 56 sets forth the standard and procedures

for granting a motion for summary judgment.  Rule 56(a) provides, "[t]he court

shall grant summary judgment if the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23

(1986).  A factual dispute is "material" if it might affect the outcome of the suit

under the applicable substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 248 (1986).  A factual dispute is "genuine" only if there is a sufficient

18

evidentiary basis that would allow a reasonable fact-finder to return a verdict for the non-moving party. *Id.* When evaluating a motion for summary judgment, a court "must view the facts in the light most favorable to the non-moving party," and draw all reasonable inferences in favor of the same. *Hugh v. Butler Cnty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005), *cert. denied*, 546 U.S. 1094 (2006).

The moving party bears the initial burden of demonstrating the absence of a disputed issue of material fact. *See Celotex*, 477 U.S. at 324. "Once the moving party points to evidence demonstrating no issue of material fact exists, the non-moving party has the duty to set forth specific facts showing that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor." *Azur v. Chase Bank, USA, Nat'l Ass'n*, 601 F.3d 212, 216 (3d Cir. 2010). The non-moving party may not simply sit back and rest on the allegations in its complaint; instead, it must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (internal quotations omitted); *see also Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001). Summary judgment should be granted where a party "fails to make a showing sufficient to establish the existence of an element essential to that

party's case, and on which that party will bear the burden of proof at trial."

*Celotex*, 477 U.S. at 322-23. "Such affirmative evidence – regardless of whether it is direct or circumstantial – must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance." *Saldana*, 260 F.3d at 232 (quoting *Williams v. Borough of W. Chester*, 891 F.2d 458, 460-61 (3d Cir. 1989)).

## III.    <u>Discussion</u>

In the instant motion, Defendants argue summary judgment should be granted in their favor because: (1) Defendants are entitled to sovereign immunity because they are being sued in their official capacities; (2) Defendants Christeleit, Rush, Sniezek, and Ask-Carlson lacked personal involvement and respondeat superior cannot form the basis of a *Bivens* action; (3) Plaintiff has failed to state an Eighth Amendment claim for deliberate indifference to his serious medical needs; (4) Defendants are entitled to qualified immunity; (5) Plaintiff cannot establish a claim of negligence against the United States; (6) Plaintiff failed to file the requisite Certificate of Merit; and (7) Plaintiff has failed to state claims of intentional infliction of emotional distress and negligent infliction of emotional

distwith.[10]

A.    **Sovereign Immunity**

Defendants argue that the claims brought against the individual Defendants

in their official capacities are barred by the doctrine of sovereign immunity.  The

court agrees.

While a plaintiff may assert a *Bivens* claim against individual federal

officials acting in their individual capacities, they may not sue to recover monetary

damages against federal officials in their official capacities.  *See Reynolds v. Fed.

Bureau of Prisons*, Civ. No. 09-3096, 2010 WL 744127, *3 (E.D. Pa. Mar. 2,

2010).  An action against government officials in their official capacities

constitutes an action against the United States and its federal agencies such as the

BOP; and *Bivens* claims against the United States are barred by sovereign

immunity, absent an explicit waiver.  *See Fed. Deposit Ins. Corp. v. Meyer*, 510

U.S. 471, 483 (1994); *Jaffee v. United States*, 592 F.2d 712, 717 (3d Cir. 1979).

"Congress has not waived sovereign immunity for damages for constitutional

---

[10] Plaintiff asserts an additional state claim of nonmedical negligence related to a failure
to train, supervise or regulate medical staff.  (Doc. 1 at 23-25.)  Although Defendants do not
specifically address this claim in their motion for summary judgment, the court will address the
claim pursuant to 28 U.S.C. § 1915(e)(2), which provides that a "court shall dismiss the case *at
any time* if the court determines that . . . the action or appeal . . . fails to state a claim on which
relief may be granted." 28 U.S.C. § 1915(e)(2) (emphasis added).  *See also* 28 U.S.C.
1915A(b)(1).

violations." *Germosen v. Reno*, Civ. No. 99-1268, slip op. at 13 (M.D. Pa. Sept. 20, 2000), *aff'd* 90 F. App'x 435. Therefore, Plaintiff's claims for monetary damages under *Bivens* against Defendants in their official capacities are barred, and summary judgment will be granted in favor of Defendants.

### B. Personal Involvement and Respondeat Superior

Defendants Christeleit, Rush, Sniezek, and Ask-Carlson argue that Plaintiff has failed to establish that they had personal involvement in his medical care for purposes of establishing a violation under the Eighth Amendment. In addition, Defendants Sniezek and Ask-Carlson argue that Plaintiff's Eighth Amendment claims against them should be dismissed because respondeat superior cannot form the basis of a *Bivens* action. The court will consider both arguments in turn.

### 1. Personal Involvement

A plaintiff, in order to state an actionable civil rights claim, must plead two essential elements: (1) that the conduct complained of was committed by a person acting under color of law; and (2) that said conduct deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States. *Groman v. Twp. of Manalapan*, 47 F.3d 628, 638 (3d Cir. 1995).

It is well established that personal liability under § 1983[11] cannot be

---

[11] *See supra*, note 1.

imposed upon a government official based on a theory of respondeat superior. *See, e.g.*, *Rizzo v. Goode*, 423 U.S. 362, 368 (1976); *Hampton v. Holmesburg Prison Officials*, 546 F.2d 1077, 1082 (3d Cir. 1976). It is also well settled in the Third Circuit that the defendant's personal involvement in alleged constitutional deprivations is a requirement in a civil rights action and that a complaint must allege such personal involvement. *Hampton*, 546 F.2d at 1082. The complaint must sow that each named defendant was personally involved in the events or occurrences upon which a plaintiff's claims are based. *Id*. As the court stated in *Rode v. Dellarciprete*:

> A defendant in a civil rights action must have personal involvement in the alleged wrongs . . . . Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence. Allegations of participation or actual knowledge and acquiescence, however, must be made with appropriate particularity.

845 F.2d 1195, 1207 (3d Cir. 1998) (citations omitted). Courts have also held that an allegation seeking to impose liability on a defendant based on supervisory status, without more, will not subject the official to section 1983 liability.[12] *Id*. at 1208.

Here, the record reflects that Defendants Christeleit, Sniezek, and Ask-Carlson did not provide medical care to Plaintiff, and therefore were not

---

[12] *See supra*, note 1.

23

personally involved in the constitutional misconduct alleged in the complaint. As

Defendants note, Defendant Christeleit was Plaintiff's assigned Case Manager

from December 2006 through April 2008, and is not a medical professional. (Doc.

31 at 23.) Further, Defendants Sniezek and Ask-Carlson, as former Warden and

Associate Warden, respectively, similarly are not medical professionals. (*Id*.) As

a result, Plaintiff's action, to the extent that it seeks to establish liability for a

constitutional violation against Defendants Christeleit, Sniezek, and Ask-Carlson

based solely on their respective supervisory capacities within FCI-Schuylkill,

cannot proceed.

Furthermore, the medical records show that Defendant Rush, a Physician's

Assistant at the relevant time, was only involved in the treatment of Plaintiff's

cataracts only on June 15, 2011, a date after Plaintiff's second cataract surgery and

after the complaint was filed in this case. (*Id*. at 23-24; Doc. 30-2 at 56-59.)

Therefore, to the extent that Plaintiff seeks to impose liability against Defendant

Rush for alleged violations set forth in the complaint, Plaintiff has failed to

establish personal involvement, and Defendant Rush will be dismissed.

### 2. **Respondeat Superior**

As set forth above, the court has already concluded that Plaintiff's action

seeking liability against Defendants Sniezek and Ask-Carlson based solely on

their respective supervisory capacities within FCI-Schuylkill cannot proceed. Further, to the extent that Plaintiff seeks to impose liability on Defendants Sniezek, Ask-Carlson, and Rush[13] based on their handling of Plaintiff's grievances related to his health care, it is well settled that, although prisoners have a constitutional right to file and seek the redress of grievances as part of their right of access to the courts, *Robinson v. Taylor*, 204 F. App'x 155, 156-57 (3d Cir. 2006), this right is not compromised by the failure of prison officials to address these grievances, *Booth v. King*, 346 F. Supp. 2d 751, 761 (E.D. Pa. 2004), because inmates do not have a constitutionally protected right to a grievance procedure, *see Jones v. N.C. Prisoners Labor Union*, 322 U.S. 119, 137-38 (1977); *see also Burnside v. Moser*, 138 F. App'x 414, 416 (3d Cir. 2005) (citations omitted) (stating that failure of prison officials to process administrative grievances did not amount to a constitutional violation). Moreover, the existence of a grievance procedure does not confer upon prison inmates any substantive constitutional rights. *Hoover v. Watson*, 886 F. Supp. 410, 418-19 (D. Del. 1995).

Here, Plaintiff seeks to impose liability against Defendants Sniezek, Ask-Carlson, and Rush based solely of their roles in the administration of his

---

[13] In his brief in opposition, Plaintiff argues that Defendant Rush is liable for the alleged Eighth Amendment violations because he responded to Plaintiff's related verbal complaints and filed grievances. (*See* Doc. 63 at 32-39.)

grievances or appeals. Participation in the after-the-fact review of a grievance or appeal is not enough to establish personal involvement. *See Rode*, 845 F.2d at 1208 (finding the filing of a grievance is not enough to show the actual knowledge necessary for personal involvement); *Brooks v. Beard*, 167 F. App'x 923, 925 (3d Cir. 2006) (holding that a state prisoner's allegation that prison officials and administrators responded inappropriately, or failed to respond to a prison grievance, did not establish that the officials and administrators were involved in the underlying allegedly unconstitutional conduct); *Croom v. Wagner*, Civ. No. 06-1431, 2006 WL 2619794, *4 (E.D. Pa. Sept. 11, 2006) (holding that neither the filing of a grievance nor an appeal of a grievance is sufficient to impose knowledge of any wrongdoing); *Ramos v. Pa. Dep't of Corr.*, Civ. No. 06-1444, 2006 WL 2129148, *2 (M.D. Pa. July 27, 2006) (holding that the review and denial of the grievances and subsequent administrative appeal does not establish personal involvement). Because the involvement of Defendants Sniezek, Ask-Carlson, and Rush is limited to their involvement in the grievance procedure review thereof, Plaintiff has failed to establish personal involvement for purposes of civil rights liability. Therefore, summary judgment will be granted in favor of Defendants Sniezek, Ask-Carlson, and Rush with respect to any claims asserted against them which are solely based on their handling of Plaintiff's grievances.

## C.     **Eighth Amendment Claim**

Defendants argue that Plaintiff has failed to state a claim of deliberate

indifference to his medical needs in violation of the Eighth Amendment.  Upon

review, the court agrees and will grant summary judgment in favor of Defendants.

Prison officials are required under the Eighth Amendment to provide basic

medical treatment to prisoners.  *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir.

1999) (citing *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).  To demonstrate a *prima*

*facie* case of Eighth Amendment cruel and unusual punishment based on the

denial of medical care, a plaintiff must establish that the defendant acted with

"deliberate indifference to [his] serious medical needs."  *Estelle*, 429 U.S. at 104

(1976); *Durmer v. O'Carroll*, 991 F.2d 64, 67 (3d Cir. 1993).  There are two

components to this standard: Initially, a plaintiff must make an "objective"

showing that the deprivation was "sufficiently serious," or that the result of the

deprivation was sufficiently serious.  Additionally, the plaintiff must make a

"subjective" showing that the defendant acted with "a sufficiently culpable state of

mind."  *Wilson v. Seiter*, 501 U.S. 294, 298 (1991); *see also Montgomery v.*

*Pinchak*, 294 F.3d 492, 499 (3d Cir. 2002).  Deliberate indifference may be

manifested by an intentional refusal to provide medical care, delayed medical

treatment for non-medical reasons, a denial of prescribed medical treatment, or a

denial of reasonable requests for treatment that results in suffering or risk of injury. *Durmer*, 991 F.2d at 68; *see also Spruill v. Gillis*, 372 F.3d 218, 235 (3d Cir. 2004) (quoting *White v. Napolean*, 897 F.2d 103, 109 (3d Cir. 1990)) (finding "deliberate indifference to serious medical needs" standard is met when pain is intentionally inflicted on a prisoner, where the denial of reasonable requests for medical treatment exposes an inmate to undue suffering or the threat of tangible residual injury, or when, despite a clear need for medical care, there is an intentional refusal to provide that care).

This test "affords considerable latitude to prison medical authorities in the diagnosis and treatment of the medical problems of inmate patients. Courts will 'disavow any attempt to second guess the propriety or adequacy of a particular course of treatment . . . which remains a question of sound professional judgment." *Little v. Lycoming County*, 912 F. Supp. 809, 815 (M.D. Pa. 1996) (citing *Inmates of Allegheny Cnty. Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979)).

Further, when an inmate is provided with medical care and the dispute is over the adequacy of that care, an Eighth Amendment claim does not exist. *Nottingham v. Peoria*, 709 F. Supp. 542, 547 (M.D. Pa. 1988). Mere disagreement as to the proper medical treatment does not support an Eighth Amendment claim. *Monmouth Cnty. Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 346 (3d Cir. 1987).

Only flagrantly egregious acts or omissions can violate the standard. Medical negligence alone cannot result in an Eighth Amendment violation, nor can any disagreements over the professional judgment of a health care provider. *White v. Napolean*, 897 F.2d 103, 108-10 (3d Cir. 1990); *see also Estelle*, 429 U.S. at 105-06 (holding that medical malpractice is insufficient basis upon which to establish an Eighth Amendment violation); *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999) ("It is well-settled that claims of negligence and medical malpractice, without some more culpable state of mind, do not constitute 'deliberate indifference.'"); *Lanzaro*, 834 F.2d at 346 (holding that "mere allegations of malpractice" do not raise issues of constitutional import).

Finally, in *Durmer*, the Third Circuit Court of Appeals added that a non-physician defendant cannot be considered deliberately indifferent for failing to respond to an inmate's medical complaints when he is already receiving treatment by the prison's medical staff. *Durmer*, 991 F.2d at 69. However, where a failure or delay in providing prescribed treatment is deliberate and motivated by non-medical factors, a constitutional claim may be presented. *See id*.

In the instant case, throughout the relevant time period, Plaintiff was seen on numerous occasions by medical staff at FCI-Schuylkill for treatment of cataracts in both eyes. He was repeatedly evaluated by his primary care provider,

Defendant PA Steffan, as well as outside contract optometrists and ophthalmologists. On September 17, 2008, Plaintiff had cataract surgery on his left eye. After that surgery, Plaintiff reported that his left eye vision had improved. In addition, after the left eye surgery, Defendant PA Steffan submitted several requests for consultations for evaluation and surgery for the cataract on Plaintiff's right eye. The URC denied the first surgery request because Plaintiff's right eye cataract did not meet the criteria in BOP policy for a medically necessary procedure. However, despite initially denying the surgery, the URC subsequently approved a consultation for an evaluation appointment with the ophthalmologist. After that evaluation, Defendant PA Steffan submitted further requests for surgery for Plaintiff's right eye cataract. The URC approved one of PA Steffan's requests, and after further evaluation, the ophthalmologist performed surgery on Plaintiff's right eye cataract on May 11, 2011. Importantly, in the cases of both his left and right eye, the ophthalmologist indicated that surgery would not necessarily improve his visual acuity. (Doc. 30 ¶¶ 46, 67; Doc. 30-1 at 46; Doc. 30-2 at 1.) Nevertheless, throughout the relevant time period, Defendant PA Steffan examined and evaluated Plaintiff's condition, and reported progress to the outside medical professionals, as well as to the institution's Health Services Administrator. Upon consideration of the foregoing, the court concludes that, as

to a claim asserted against Defendant PA Steffen, this is clearly a case of dissatisfaction with the course of treatment and subsequent results. An inmate's disagreement with medical treatment is insufficient to establish deliberate indifference. *Durmer*, 991 F.2d at 69; *Spruill*, 372 F.3d at 235. Courts will not second guess whether a particular course of treatment is adequate or proper. *Parham v. Johnson*, 126 F.3d 454, 458 n.7 (3d Cir. 1997).

Turning to the only other medical Defendant, Defendant Rush, the record shows that the only direct participation he had with Plaintiff for his cataracts was during a follow-up appointment on June 15, 2011, following the surgery on Plaintiff's right eye cataract. Without more, the court finds no basis for concluding that Defendant Rush was deliberately indifferent to a serious medical need of Plaintiff.

Moreover, there is nothing in the record demonstrating that any significant delay in treating Plaintiff's medical condition was deliberate or intentional on the part of any Defendant, or done so for non-medical reasons. With respect to his left eye, Plaintiff was seen and evaluated by Defendant PA Steffan and the contract optometrist and ophthalmologist regularly prior to his September 2008 left eye surgery. The optometrist determined that Plaintiff had cataracts in both eyes, but the cataract in the left eye was mature, thus requiring surgery on the left eye first.

The record is devoid of any evidence to support Plaintiff's apparent argument that he was diagnosed with a hypermature cataract, a more emergent condition. Nevertheless, evaluations and consultations were scheduled and performed regularly prior to Plaintiff's September 2008 surgery on his left eye. He was also prescribed eyeglasses pending the surgery to aid his vision. Based on this record, the court concludes that there are no facts to support a finding that Defendants were deliberately indifferent to Plaintiff by delaying his treatment for his left eye cataract.

Turning to his right eye cataract, Plaintiff was seen and evaluated by Defendant PA Steffan and the contract optometrist and ophthalmologist regularly prior to his May 2011 right eye surgery. Further, despite the URC's initial denial of the request for cataract surgery in March 2009, the surgery was ultimately approved and scheduled. Pending that surgery, Plaintiff was provided with new eyeglasses to aid his vision. The right eye surgery was eventually performed in May 2011. Further, the record reflects that Plaintiff's vision has improved since both surgeries. Based on this record, the court concludes that there are no facts to support a finding that Defendants were deliberately indifferent to Plaintiff by delaying his treatment for his right eye cataract.

Finally, in his opposition to the instant motion, Plaintiff generally asserts

that several of his medical records submitted by Defendants were "fraudulently generated" or falsified in order to cover up Defendants' deliberate indifference. These allegations are completely unsupported by the record, and Plaintiff offers absolutely no evidence in support of these bald allegations.[14]

In sum, under these circumstances and based upon the well-documented course of treatment set forth in the record, the court finds that Defendants were not deliberately indifferent to Plaintiff's medical needs.[15] Thus, Plaintiff has failed to establish an Eighth Amendment violation.[16] Defendants' motion for summary

---

[14] As explained by Defendants, Plaintiff cites to notations on the medical records in support of his argument that Defendants falsified the medical records to cover up their deliberate indifference. (Doc. 74 at 13.) Defendants further explain:

> [Plaintiff] points to the "when generated" notation at the bottom of the pages to assert that although the medical records are marked as having been prepared by one provider on one date, the footer notation and date accurately reflect the date and provider who generated the record. [(Doc. 64 ¶¶ 63, 66, 70, 71, 72, 73.)] [Plaintiff] alleges his records were falsified to cover up the deliberate indifference suffered at the hands of Defendants. (*Id.*) In fact, the "when generated" notation actually signifies when the record was printed and by whom. It is entirely possible that copies of portions of the medical records obtained by the undersigned and the copies of records obtained by [Plaintiff] through the administrative remedy procedure or general request, are identical records with different "when generated" notations.

(*Id.*)

[15] Where the medical Defendants PA Steffan and PA Rush have not been found to be deliberately indifferent in their treatment of Plaintiff, the non-physician Defendants Christeleit, Sniezek, and Ask-Carlson cannot be liable. *See Durmer*, 991 F.2d at 69.

[16] Because the court has concluded that a viable civil rights claim has not been set forth against any of the Defendants, Defendants' argument with respect to qualified immunity need not be addressed.

judgment will be granted.

## D.   FTCA Claim of Negligence

Defendants argue that Plaintiff has failed to establish an FTCA claim of negligence.[17]   In addition, Defendants also argue that the negligence claim must be dismissed because Plaintiff failed to file a certificate of merit as required under Pennsylvania law.  The court will discuss both arguments in turn.

### 1.   FTCA Claim

A federal district court addressing an FTCA action is required to apply the law of the state, in this case Pennsylvania, in which the alleged tortious conduct occurred.  28 U.S.C. § 1346(b); *see also Gould Elec., Inc. v. United States*, 220 F.3d 169, 179 (3d Cir. 2000) (citing § 1346(b)).  Under Pennsylvania law, in order to establish a *prima facie* case of medical malpractice, a plaintiff must establish: (1) a duty owed by the physician to the patient; (2) a breach of that duty; (3) that the breach of duty was the proximate cause of, or a substantial factor in, bringing about the harm suffered by the patient; and (4) damages suffered by the patient

---

[17] The only proper defendant in an FTCA action is the United States itself.  *See* 28 U.S.C. § 2679(b)(1).  *See also CNA v. United States*, 535 F.3d 132, 138 n.2 (3d Cir. 2008) (noting that, under the FTCA, the only party potentially answerable for any alleged injury is the United States).  In this case, Plaintiff did not name the United States as a Defendant in this action.  In his brief in opposition to the instant motion, Plaintiff seeks leave to amend his complaint to include the United States as a named Defendant for purposes of this FTCA claim.  (Doc. 63 at 41.)  As a result, for purposes of disposition of the instant motion for summary judgment, the court will construe this FTCA claim as one brought against the United States only.

were a direct result of that harm. *Mitzelfelt v. Kamrin*, 584 A.2d 888, 891 (Pa. 1990). In cases involving federal prisoners, the duty of care is one of ordinary diligence. *Hossic v. United States*, 682 F. Supp. 23, 24-25 (M.D. Pa. 1987). Further, in order to present a *prima facie* case of medical malpractice/negligence under Pennsylvania law, "as a general rule, a plaintiff has the burden of presenting expert opinions that the alleged act or omission of the defendant physician or hospital personnel fell below the appropriate standard of care in the community, and that the negligent conduct caused the injuries for which recovery is sought." *Simpson v. Bureau of Prisons*, No. 3:cv-02-2313, 2005 WL 2387631, *5 (M.D. Pa. Sept. 28, 2005); *see also Toogood v. Rogal*, 824 A.2d 1140, 1145 (Pa. 2003) ("Because the negligence of a physician encompasses matters not within the ordinary knowledge and experience of laypersons a medical malpractice plaintiff must present expert testimony to establish [a *prima facie* case of medical malpractice].").  The only exception to this requirement is when a matter "is so simple or the lack of skill or care is so obvious as to be within the range of experience and comprehension of even non-professional persons." *Simpson*, 2005 WL 2387631, *5 (quoting *Hightower-Warren v. Silk*, 698 A.2d 52, 54 n.1 (Pa. 1997)).  The Pennsylvania Supreme Court has indicated that this "very narrow exception" is implicated only in instances of *res ipsa loquitur*. *Toogood*, 824 A.2d

35

at 1145. *See also Simpson*, 2005 WL 2387631, *6 (noting the rarity of instances in which expert opinions may be unnecessary).

In their brief in support of summary judgment, Defendants claim they were not under a duty to perform an elective surgery that has been deemed by the BOP as medically acceptable, but not always necessary. (Doc. 31 at 36.) In support, Defendants cite to both BOP policy and guidelines used to determine that Plaintiff's cataract surgery was medically acceptable, but not always necessary. Specifically, according to BOP Program Statement 6031.01, "Patient Care": "Medical conditions . . . are considered elective procedures, when treatment may improve the inmate's quality of life." In addition, the BOP Clinical Practice Guidelines for Ophthalmology, only "medically indicated, *emergent or urgent* ophthalmologic surgeries should never be delayed." *See* OPHTHALMOLOGIST GUIDE (emphasis in original). Otherwise, elective ophthalmologic surgery requires the Medical Director's approval. *Id*. Reviewing the policy and guidelines, the court finds that, while it may be true that Defendants were not under a duty to perform an elective procedure, they still had a duty to provide Plaintiff with appropriate medical care. To that end, Plaintiff has not shown that Defendants failed in that duty. Rather, the record reflects that Plaintiff was examined and evaluated many times by Defendant PA Steffan, as well as the

contract optometrist and ophthalmologist. In the cases of both his left and right eyes, the ophthalmologist noted that he could not guarantee improvement of Plaintiff's visual acuity following surgery. However, tests were performed to facilitate treatment of Plaintiff's condition, and prescriptions for eyeglasses were provided to ease his discomfort while awaiting approval for the elective surgeries on his cataracts. Eventually, Plaintiff did have surgeries on both eyes, and the record reflects that his vision resultantly improved, despite the ophthalmologist's warning that it may not. In light of this record, the court cannot say that Defendants breached a duty of care owed to Plaintiff, let alone that any possible breach was the proximate cause of a harm suffered by Plaintiff. Moreover, it is important to note that Plaintiff has not presented expert testimony that the examinations and treatment provided by Defendants fell outside any accepted standard of care owed to Plaintiff in this case. *See infra*, Section III.D.2. Without such expert testimony, Plaintiff cannot establish that the alleged act or omission of Defendants fell below the appropriate standard of care in the community, and that the negligent conduct caused the injuries for which recovery is sought. *See Simpson,* 2005 WL 2387631 at *5. Accordingly, Plaintiff cannot establish a claim of negligence. Therefore, Defendant United States is entitled to summary judgment on Plaintiff's FTCA claim.

### 2.    <u>Certificate of Merit</u>

Further, in cases such as this one asserting a claim of negligence,

Pennsylvania law requires that a plaintiff file a certificate of merit.  Pennsylvania

Rule of Civil Procedure 1042.3 explains the requirement as follows:

> In any action based upon an allegation that a licensed professional
> deviated from an acceptable professional standard, the attorney for
> the plaintiff, or the plaintiff if not represented, shall file with the
> complaint or within sixty days after the filing of the complaint, a
> certificate of merit signed by the attorney or party that either
>
> (1) an appropriate licensed professional has supplied a written
> statement that there exists a reasonable probability that the care, skill
> or knowledge exercised or exhibited in the treatment, practice or
> work that is the subject of the complaint, fell outside acceptable
> professional standards and that such conduct was a cause in bringing
> about the harm, or
>
> (2) the claim that the defendant deviated from an acceptable
> professional standard is based solely on allegations that other licensed
> professionals for whom this defendant is responsible deviated from an
> acceptable professional standard, or
>
> (3) expert testimony of an appropriate licensed professional is
> unnecessary for prosecution of the claim.
>
> * * *
>
> (d) The court, upon good cause shown, shall extend the time for filing
> a certificate of merit for a period not to exceed sixty days.  A motion
> to extend the time for filing a certificate of merit must be filed by the
> thirtieth day after the filing of a notice of intention to enter judgment

of non pros on a professional liability claim under Rule 1042.6(a) or on or before the expiration of the extended time where a court has granted a motion to extend the time to file a certificate of merit, whichever is greater. The filing of a motion to extend tolls the time period within which a certificate of merit must be filed until the court rules upon the motion.

Pa. R. Civ. P. 1042.3(a), (d). The purpose of the required certificate of merit is to "assure that malpractice claims for which there is no expert support will be terminated at an early stage in the proceedings." *Chamberlain v. Giampapa*, 210 F.3d 154, 160 (3d Cir. 2000).

Rule 1042.3(a) applies to both *pro se* and represented plaintiffs and constitutes a rule of substantive state law with which plaintiffs in federal court must comply. *See Iwanejko v. Cohen & Grigsby, P.C.*, 249 F. App'x 938, 944 (3d Cir. 2007) (holding that district courts must "appl[y] Rule 1042.3 as substantive state law"); *Paige v. Holtzapple*, No. 1:08-cv-0978, 2009 WL 2588849, *3 (M.D. Pa. Aug. 19, 2009) (citing *Iwanejko*, 249 F. App'x at 944); *Fernandez v. Dep't of Justice*, No. 3:07-cv-01080, slip op. at 10 (M.D. Pa. Sept. 2, 2008) (recognizing that the plaintiff's *pro se* status "is not a viable basis upon which to excuse compliance with Rule 1042.3 or the requirement of com[i]ng forth with expert medical testimony").

Failure to file a certificate of merit under Rule 1042.3(a) or a motion for an

extension under Rule 1042.3(d) is fatal unless the plaintiff demonstrates that his

failure to comply is justified by a "reasonable excuse." *Perez v. Griffin*, 304 F.

App'x 72, 74 (3d Cir. 2008); *see also Walsh v. Consol. Design & Eng'g, Inc.*, No.

Civ. A. 05-2001, 2007 WL 2844829, *5 (E.D. Pa. Sept. 28, 2007) ("Rule 1042.3 is

subject to equitable considerations and a party who fails to timely file a certificate

of merit may be relieved from the requirement where the defaulting party provides

a reasonable explanation or legitimate excuse.").

In the instant case, Plaintiff alleges that he was not provided with timely and

proper medical care for the cataracts diagnosed in both eyes. He alleges that the

delay in undergoing surgeries on both eyes and failure of FCI-Schuylkill medical

staff to treat his condition constituted negligence. Based upon the nature of these

claims, Plaintiff must come forward with expert testimony to state a *prima facie*

case of negligence/medical malpractice.

Plaintiff has not submitted a Rule 1042.3 certificate of merit, identified any

medical expert or submitted a report from any medical expert, and it is beyond the

time in which Plaintiff may do so. In response to Defendants' motion for

summary judgment, Plaintiff concedes that he did not file a certificate of merit, but

claims that one was not needed because his medical problem was so obvious that a

layperson could recognize it. (Doc. 63 at 41-44.) In support, Plaintiff first claims

that the consultation reports indicated on several occasions that his "visual acuity was deteriorating to the point of virtual blindness." (*Id*. at 42.) He claims Defendants' delay in having surgery performed caused his "state of blindness" and therefore constitutes an instance of *res ipsa loquitor*. (*Id*.) He further states that "permitting a person's vision to deteriorate to the point of legal blindness and to the extent of allowing the cataracts to reach a hypermature stage resulting in permanent blindness, constitutes injury within the scope of the FTCA." (*Id*. at 45.) However, none of the consultation reports contain such language or diagnoses. In fact, the consultation reports simply state that Plaintiff had cataracts in each eye and should have them surgically removed; none diagnose Plaintiff with "virtual blindness" or a "hypermature [cataract] with the result of permanent blindness." The record also shows that when Plaintiff had surgeries on both cataracts, his vision improved as a result, despite the ophthalmologist not guaranteeing an improvement in Plaintiff's visual acuity.

In further support of his contention that medical expert testimony is not necessary in his case, Plaintiff argues that Defendants breached their duty to Plaintiff by relying on BOP guidelines, which caused an unnecessary delay of surgical removal of his right eye cataract, rather than the specialists' recommendation to perform surgery ASAP. (*Id*. at 43-44.) However, Plaintiff has

not alleged that any Defendant was involved in the development and implementation of the guidelines which unnecessarily delayed his surgery. Without any showing of personal involvement on the part of any Defendant, Plaintiff cannot show that Defendants breached a duty here. Further, the records reflects that Defendants did treat Plaintiff as recommended by the specialists: surgery was recommended for both cataracts, and surgery was performed on both cataracts.

Upon review, the court concludes that, based on Plaintiff's assertions here, he has failed to establish an exception to the requirement to file a certificate of merit. Rather, expert testimony would be necessary to establish that Plaintiff required surgery within a certain time period, and that the failure to timely provide surgery caused injury. Therefore, Plaintiff was required to file a certificate of merit. Because Plaintiff has failed to file such documentation, his FTCA claim and any pendant state law tort claim of medical malpractice will be dismissed.[18]

## E.     Remaining State Law Claims

In addition to his state law claim of negligence, Plaintiff has also set forth

---

[18] In his brief in opposition, Plaintiff requests leave to amend this claim in order to file a certificate of merit. (Doc. 63 at 43.) Based on the court's finding that Plaintiff has failed to establish a claim of negligence in this case, the court will deny Plaintiff's request for leave to amend on the basis of futility. *See Alston v. Parker*, 363 F.3d 229, 236 (3d Cir. 2004) ("Dismissal without leave to amend is justified only on the grounds of bad faith, undue delay, prejudice, or futility.").

state claims of intentional infliction of emotional distress, negligent infliction of emotional distress, and a nonmedical negligence claim relating to alleged failure by the BOP to train, supervise or regulate staff. The court will address these claims in turn.

### 1. **Intentional Infliction of Emotional Distress**

In Pennsylvania, "[o]ne who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm." *Taylor v. Albert Einstein Med. Ctr.*, 754 A.2d 650, 652 (Pa. 2000). Such tortious conduct, "'must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society.'" *Hoy v. Angelone*, 720 A.2d 745, 753 (Pa. 1998) (quoting *Buczek v. First Nat'l Bank of Mifflintown*, 531 A.2d 1122, 1125 (Pa. Super. Ct. 1987)). Under this standard, "[i]t has not been enough that the defendant has acted with an intent which is tortuous or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort." *Daughen v. Fox*, 539 A.2d 858, 861 (Pa. Super. Ct. 1988) (quoting Restatement

(Second) of Torts § 46(1) (1965), Comment(d)).

Here, Plaintiff has failed to establish any conduct on the part of any Defendant that would constitute an intentional infliction of emotional distress. In fact, Plaintiff has not alleged anything close to the extreme and outrageous conduct that would give rise to such a claim. *See, e.g.*, *Hoy*, 720 A.2d at 754 (citing *Papieves v. Lawrence*, 263 A.2d 118 (Pa. 1970) (defendant, after striking and killing plaintiff's son with an automobile, and after failing to notify authorities or seek medical assistance, buried body in a field where it was discovered two months later and returned to parents); *Banyas v. Lower Bucks Hosp.*, 437 A.2d 1236 (Pa. Super. Ct. 1981) (defendants intentionally fabricated records to suggest that plaintiff had killed a third party which led to plaintiff being indicted for homicide); *Chuy v. Phila. Eagles Football Club*, 595 F.2d 1265 (3d Cir. 1979) (defendant's team physician released to press information that plaintiff was suffering from fatal disease, when physician knew such information was false)); *Johnson v. Caparelli*, 625 A.2d 668, 672 (Pa. Super. Ct. 1993) (regarding a priest's sexual abuse of altar boy); *Field v. Phila. Elec. Co.*, 565 A.2d 1170, 1183-84 (Pa. Super. Ct. 1989) (discussing claim that defendant deliberately vented highly radioactive steam on the plaintiff and attempted to conceal overexposure to radiation). Based on this case law and the record in this case, Plaintiff has not

stated a claim for intentional infliction of emotional distress.

## 2. Negligent Infliction of Emotional Distress

Plaintiff has also failed to state a claim of negligent infliction of emotional distress. Under Pennsylvania law, "the cause of action for negligent infliction of emotional distress is restricted to four factual scenarios: (1) situations where the defendant had a contractual or fiduciary duty toward the plaintiff; (2) situations where the plaintiff was subjected to a physical impact; (3) situations where the plaintiff was in a zone of danger, thereby reasonably experiencing a fear of impending physical injury; and (4) situations where the plaintiff observed a tortious injury to a close relative." *Toney v. Chester County Hosp.*, 961 A.2d 192, 197-98 (Pa. Super. Ct. 2008) (citing *Doe v. Phila. Cmty. Health Alts. AIDS Task Force*, 745 A.2d 25, 26 (Pa. Super. Ct. 2000). Here, the facts of record do not fit into any of these scenarios. Notably, the court has already determined that Plaintiff has failed to establish that Defendants breach a duty that caused Plaintiff to suffer an injury. As the record shows that Plaintiff's vision actually improved after the cataract surgeries, and he does not provide any evidence to show that the timing of the cataract surgeries caused him any substantial physical harm, Plaintiff has failed to establish a claim for negligent infliction of emotional distress.

## 3. Nonmedical Negligence

Plaintiff alleges that the BOP failed to properly train, supervise or regulate staff. Upon review, this claim will be dismissed for failure to state a claim. *See* 28 U.S.C. 1915(e)(2).

Absent direct involvement, a plaintiff can hold a supervisor liable for failure to train or supervise if the supervisor has shown deliberate indifference to the plight of the person involved. *Carter v. City of Phila.*, 181 F.3d 339, 357 (3d Cir. 1999); *Pair v. Danberg*, Civ. No. 08-458-GMS, 2008 WL 4570537, *2 (D. Del. Oct. 14, 2008) (internal quotations and citations omitted) ("In order for a supervisory official to be held liable for a subordinate's constitutional tort, the official must either be the moving force behind the constitutional violation or exhibit deliberate indifference to the plight of the person deprived."). A claim for supervisory liability or liability based upon a failure to train involves four elements: (1) that an existing policy created an unreasonable risk of constitutional injury; (2) that the supervisor was aware of the potential for this unreasonable risk; (3) that the supervisor was indifferent to the risk; and (4) that the injury resulted from the policy or practice. *Sample v. Diecks*, 885 F.2d 1099, 1118 (3d Cir. 1989); *see also Heggenmiller v. Edna Mahan Corr. Inst.*, 128 F. App'x 240 (3d Cir. 2005) (not published).

Here, Plaintiff's allegations include general statements that the BOP failed

to properly train, supervise, and regulate its medical staff. These statements are not directed towards any Defendant. It is evident in reading the complaint that Plaintiff has failed to meet the pleading requirements of *Twombly* and *Iqbal*. The failure to train and supervise claim is entirely conclusory and fails to identify individual Defendants. Thus, the court will dismiss this claim for failure to state a claim pursuant to 28 U.S.C. § 1915(e)(2)(B) and § 1915A(b)(1). Further, because Plaintiff has failed to establish any related claims, granting leave to amend here would be futile. *See Alston*, 363 F.3d at 236.

## IV.    Conclusion

For the reasons set forth herein, the motion for summary judgment will be granted in favor of Defendants.

An appropriate order will issue.


S/Sylvia H. Rambo
United States District Judge



Dated: July 30, 2013.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JOHN FERGUSON,** | : | |
| | : | |
| **Plaintiff** | : | **CIVIL NO. 1:CV-10-02638** |
| | : | |
| **v.** | : | **(Judge Rambo)** |
| | : | |
| **T.R. SNIEZEK,** *et al.*, | : | |
| | : | |
| **Defendants** | : | |

**O R D E R**

In accordance with the accompanying memorandum, **IT IS HEREBY**

**ORDERED THAT**:

1) Defendants Hendershot, Falzini, Burns, and Zabala are **DISMISSED** as

parties in this action. *See* Fed. R. Civ. P. 4(c)(1).

2) The motion for summary judgment (Doc. 20) is **GRANTED**.

3) The Clerk of Court is directed to **ENTER** judgment in favor of

Defendants Sniezek, Ask-Carlson, Christeleit, Rush, Steffan, and Federal Bureau

of Prisons and against Plaintiff.

4) The Clerk of Court is directed to **CLOSE** this case.

S/Sylvia H. Rambo
United States District Judge

Dated: July 30, 2013.